UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLES FERRARE, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>v.<br><br>VODAFONE GROUP PUBLIC LIMITED COMPANY, VITTORIO COLAO and NICK READ,<br><br>                              Defendants. | Case No. _____<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Charles Ferrare ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Vodafone Group Public Limited Company ("Vodafone" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired Vodafone American Depositary Receipts ("ADRs") from February 11, 2015 through January 11, 2018, both dates inclusive ("Class Period"), seeking to recover compensable damages caused by

Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Vodafone is one of the world's largest telecommunications companies and provides a range of services including voice, messaging, data and fixed communications. The Company has mobile operations in 26 countries, partners with mobile networks in 50 more, and fixed broadband operations in 19 markets.

3.      Defendants made false and/or misleading statements and/or failed to disclose that: (i) Vodafone had contravened Australian law by permitting customers to purchase pre-paid mobile phones without first verifying their identities, and (ii) as a result of the foregoing, Vodafone's public statements were materially false and misleading at all relevant times.

4.      On January 10, 2018, post-market, the Australian Communications and Media Authority ("ACMA)" announced that an investigation into the Company's subsidiary Vodafone Network Pty Limited ("Vodafone Australia") revealed that the Company had contravened Australian law by permitting customers to purchase pre-paid mobile phones without first verifying their identities. Specifically, Vodafone Australia's website allowed customers to select that their identity had been verified in a store and then proceed to activate their service through use of the website without confirming that the customers' identities had in fact been verified, as required by law.

5.      On this news, Vodafone's ADRs declined from a close price of $32.60 on January 09, 2018, to a close price of $31.44 on January 11, 2018, a drop of approximately -3.5% over two trading days.

6.      As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's ADRs, Plaintiff, and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in this District.

## PARTIES

10.      Plaintiff purchased Vodafone's ADRs within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit A.

11.      Defendant Vodafone is a London company with principal offices located at The Connection, Newbury, Berkshire, Rg14 2fn, England. The Company also maintains an American regional headquarter at 560 Lexington Avenue, 9th Floor, New York, NY 10022. The Company common stock trades on the NASDAQ under the ticker symbol "VOD."

12.     Defendant Vittorio Colao ("Colao") has served at all relevant times as the Company's Chief Executive Officer ("CEO").

13.     Defendant Nick Read ("Read") has served at all relevant times as the Company's Chief Financial Officer ("CFO").

14.     Defendants in paragraphs 12-13 are collectively referred to herein as the "Individual Defendants."

15.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)     was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f)     approved or ratified these statements in violation of the federal securities laws.

16.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Vodafone's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal

corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

17.     As officers of a publicly-held company whose ADRs were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded ADRs would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

18.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Vodafone's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded

herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Vodafone's ADRs by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Vodafone's business, operations, management and the intrinsic value of its ADRs and (ii) caused Plaintiff and other shareholders to purchase Vodafone's ADRs at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

20.     Vodafone is one of the world's largest telecommunications companies and provides a range of services including voice, messaging, data and fixed communications. The Company has mobile operations in 26 countries, partners with mobile networks in 50 more, and fixed broadband operations in 19 markets.

*Telecommunications*
*(Service Provider- Identify Checks for Prepaid Mobile Carriage Services)*
*Determination 2013*

21.     Under section 2.3 of the Australian Telecommunications (Service Provider - Identity Checks for Prepaid Mobile Carriage Services) Determination 2013 ("the Determination"), mobile service providers are required to obtain and verify a customer's identification ("ID") when they purchase or activate a mobile prepaid service. The Determination was made in November 2013 by the ACMA under the Telecommunications Act 1997 (the "Act").

22.     Under section 101 (1) of the Act, service providers must comply with service provider rules that apply to the provider.

23.     Under subsection 313(3) of the Act, carriage service providers must provide agencies with such help as is reasonably necessary for the following purposes:

    a)  Enforcing the criminal law and laws imposing pecuniary penalties;

    b)  Assisting the enforcement of the criminal laws in force in a foreign country;

    c)  Protecting the public revenue; and

    d)  Safeguarding national security.

24.     Under Part 14 of the Act, the ACMA and carriage service providers must do their best to prevent or minimize the risk of telecommunications networks and facilities from being used in, or in relation to, the commission of offenses against the laws of the Commonwealth or the States or Territories.

*Law Enforcement Disclosure Reports*

25.     On June 06, 2014, Vodafone published the Vodafone Group Plc Sustainability Report ("2014 Sustainability Report") containing Vodafone's Law Enforcement Disclosure Report for the period April 1, 2013 to March 31, 2014 ("2013/2014 Disclosure Report") and its Legal Annexe ("2014 Legal Annexe"), which provides a detailed insight into the legal frameworks, governance principles and operating procedures associated with responding to demands for assistance from law enforcement and intelligence agencies across 29 countries.

**B.     Material Misstatements and Omissions during the Class Period**

26.     The Class Period begins on February 11, 2015, when Vodafone updated its 2014 Legal Annexe to the Company's 2013/2014 Disclosure Report ("2015 Legal Annexe"). Throughout the 2015 Legal Annexe, the Company made the following statements reaffirming previous disclosures:

**Australia**

7

In this report we provide an overview of some of the legal powers under the Commonwealth Law of Australia that government agencies have to order Vodafone's assistance with conducting real-time interception and the disclosure of data about Vodafone's customers.

Australia is a Federation containing three separate types of legislation: Commonwealth, State and Territory. This report focuses on the legal powers available under Commonwealth Law.

## 1.  PROVISION  OF  REAL-TIME  LAWFUL  INTERCEPTION ASSISTANCE

**Telecommunications Act 1997**

Carriers and carriage service providers ("carriers") (such as Vodafone) have legislative obligations under the Telecommunications Act 1997 ("TA") to provide assistance to law enforcement agencies and national security agencies with the interception of individual customer communications (live communications) where authorised.

Section 313(3) of the TA requires carriers to give the authorities such help as is reasonably necessary for the purposes of: (i) enforcing the criminal law and laws imposing pecuniary penalties; (ii) protecting the public revenue; and (iii) safeguarding national security.

\*   \*   \*

Section 313(1) of the TA requires a carrier to do its best to prevent telecommunication networks and facilities from being used in, or in relation to, the commission of offences against the laws of the Commonwealth or the States and Territories. Examples of the kind of help law enforcement and national security agencies might request under section 313(3) TA include: (i) the provision of interception services; (ii) information from a carrier's information base, such as billing records and (iii) assistance in tracing a call.

27.     On May 19, 2015, Vodafone released its annual report for the fiscal year ended March 31, 2015 ("2015 Annual Report"). The 2015 Annual Report was also filed as Form 20-F with the SEC on June 8, 2015 and was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. In the 2015 Annual Report, the Company stated in relevant part:

**Privacy and human rights**
The amount of data and personal information transmitted over our networks continues to increase. Our commitment to protecting that information and

respecting our customers' right to privacy and freedom of expression remains critical in retaining their trust.

***We are one of the first communications operators in the world to provide a country-by-country analysis of demands received for access to our customers' data by law enforcement authorities, through the publication of our Law Enforcement Disclosure report.***

***This report explains our principles and approach, as well as the policies and processes we follow when responding to demands from government agencies and authorities.*** It also sets out the framework within which we believe governments should act.

Emphasis added.

28.    On July 15, 2015, Vodafone published an update to the 2013/2014 Disclosure Report ("2015 Disclosure Report"). In the 2015 Disclosure Report, the Company stated in relevant part:

**Law Enforcement Disclosure Report 2015**

**This is our second annual transparency report which offers a detailed insight into the legal frameworks, governance principles and operating policies and procedures associated with responding to demands for assistance from law enforcement and intelligence agencies across 28 countries.**

**We have retained much of the explanatory text used in the 2014 report which sets out our principles and practices in what remains a significant area of public debate and concern.**

*       *       *

**Complex, controversial – and constantly changing**
Our customers have a right to privacy which is enshrined in international human rights law and standards, and enacted through national laws. Respecting that right is one of our highest priorities: it is integral to the Vodafone Code of Conduct which everyone who works for us has to follow at all times*.*

***In every country in which we operate, we also have to abide by the laws of those countries which require us to disclose information about our customers to law enforcement agencies or other government authorities, or to block or restrict access to certain services, content or networks***. Those laws are designed to protect national security and public safety or to prevent or investigate crime

and terrorism, and the agencies and authorities that invoke those laws insist that the information demanded from communications operators such as Vodafone is essential to their work.

***Refusal to comply with a country's laws is not an option.*** If we do not comply with a lawful demand for assistance, governments can remove our licence to operate, preventing us from providing services to our customers.

Emphasis added.

29.     On May 17, 2016, Vodafone released its annual report for the fiscal year ended March 31, 2016 ("2016 Annual Report"). The 2016 Annual Report was also filed as Form 20-F with the SEC on June 10, 2016 and was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. With regards to risks and compliance, the Company referred investors to the 2015 Disclosure Report.

30.     On May 31, 2017, Vodafone published an update to the 2015 Disclosure Report ("2017 Disclosure Report"). In the 2017 Disclosure Report the Company stated in relevant part:

**What we are publishing and why**

**This is our third Law Enforcement Disclosure Statement in which we seek to offer some insights into the legal frameworks, governance principles and operating policies and procedures associated with responding to demands for assistance from law enforcement and intelligence agencies.**

We continue to retain much of the explanatory text used when we published our first Law Enforcement Disclosure Report in July 2014 as our core principles and practices are unchanged. In addition, our explanation of the policies and processes we follow when responding to demands for assistance from agencies and authorities remains relevant and is repeated here.

The statistical information in this Statement covers the period from 1 April 2015 to 31 March 2016 with some additional commentary on events after that period. It encompasses the activities of our local market operating companies in 26 countries (including our joint ventures and associates) plus two other countries in which we have received a lawful demand for assistance from a law enforcement agency or government authority.

\*   \*   \*

**How we work with law enforcement agencies and government authorities**

**At Vodafone, our customers' privacy is paramount. We have strict governance controls in place across all of our businesses worldwide to ensure the protection of our customers' data and communications. We are committed to following the UN Guiding Principles on Business and Human Rights.**

***As we explain in our Privacy and Law Enforcement Principles, Vodafone is committed to meeting its obligations to respond to agencies' and authorities' lawful demands*** but will not go beyond what is mandated in law (other than under specific and limited circumstances, again outlined below). Abiding by those principles can be challenging in certain countries at certain times.

\* \* \*

**Mandatory compliance with lawful demands**

We will provide assistance in response to a demand issued by an agency or authority with the appropriate lawful mandate and where the form and scope of the demand is compliant with the law. ***Each of our local operating businesses is advised by senior legal counsel with the appropriate experience to ensure compliance with both the law and with our own Principles***.

Emphasis added.

31.     In the 2017 Disclosure Report, the Company also published an update to the 2015

Legal Annexe ("2016 Legal Annexe") following an analysis completed in the spring of 2016. In

the 2016 Legal Annexe the Company stated in relevant part:

This content was updated following analysis that was conducted in spring 2016.

Australia is a federation containing three separate types of legislation: Commonwealth, state and territory. This report focuses on the legal powers available to the Australian government and law enforcement agencies under commonwealth law.

**Real-time interception and disclosure powers**
**1. Provision of real-time lawful interception assistance**

**Telecommunications Act 1997**
Carriers and carriage service providers (carriers), such as Vodafone, have legislative obligations under the Telecommunications Act 1997 (TA) to provide assistance to law enforcement agencies and national security agencies with the

11

interception of individual customer communications (live communications) where authorised.

Section 313(3) of the TA requires carriers to give officers and authorities of the Commonwealth such help as is reasonably necessary for the purposes of: (i) enforcing the criminal law and laws imposing pecuniary penalties; (ii) assisting the enforcement of the criminal laws in force in a foreign country; (iii) protecting the public revenue; and (iv) safeguarding national security.

\*   \*   \*

Section 313(1) of the TA requires a carrier to do its best to prevent telecommunication networks and facilities from being used in, or in relation to, the commission of offences against the laws of the Commonwealth or the States and Territories. Examples of the kind of help law enforcement and national security agencies might request under section 313(3) of the TA include: (i) the provision of interception services; (ii) information from a carrier's information base, such as billing records; and (iii) assistance in tracing a call.

32.     The statements in paragraphs ¶23-¶30 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Vodafone had contravened Australian law by permitting customers to purchase pre-paid mobile phones without first verifying their identities, and (ii) as a result of the foregoing, Vodafone's public statements were materially false and misleading at all relevant times.

## C.     The Truth Emerges

33.     On January 10, 2018, post-market, the ACMA issued a press release entitled "Vodafone breaches verification rules for prepaid mobiles" disclosing that ACMA conducted an investigation into Vodafone Australia from December 1, 2014 to February 26, 2016 and from April 12, 2016 to April 28, 2016 ("Jan. 2018 Press Release"). The investigation revealed that between January 6, 2015 and January 6, 2016, the Company "***failed to verify the identity of at least 1,028***

*customers before activating their prepaid mobile services.*" The press release stated in relevant part:

> This follows an ACMA investigation that found the company failed to verify the identity of at least 1,028 customers before activating their prepaid mobile services.
>
> The Telecommunications (Service Provider – Identity Checks for Prepaid Mobile Carriage Services) Determination 2017 (the Determination) requires all telcos to verify the identity of customers of prepaid mobile services before activating their services.
>
> 'Verifying the identity of prepaid mobile customers helps law enforcement and national security agencies obtain accurate information about the identity of customers for the purposes of their investigations,' said ACMA Acting Chair, James Cameron.
>
> The breaches occurred between 6 January 2015 and 6 January 2016. They resulted from changes to Vodafone's IT systems that allowed customers to self-select online that their identity had been verified in store, without any further check that this had actually occurred.
>
> 'Telcos must check that changes to their IT systems don't run the risk of contravening legal requirements,' Mr Cameron added.

34.     The press release also disclosed that the ACMA and Vodafone Australia entered into an enforceable undertaking for the Company to "*improve its processes for verifying the identity of prepaid mobile customers*" ("Undertaking"). The Undertaking stated in relevant part:

> 5     On the basis of the documents and information obtained during the course of its investigation, the ACMA found that Vodafone Hutchison Australia Pty Limited ACN 096 304 620 (VHA) contravened:
>
> (a)     section 2.3 of the Prepaid Determination on at least 1,028 occasions in relation to at least 1,028 Prepaid Mobile Services which it supplied, because it activated those services without first complying with the rules set out in Parts 4 or 5 of that Determination; and
>
> (b)     sub-section 101 (1) of the Telecommunications Act on at least 1,028 occasions as it did not comply with the service provider rules that applied to it, namely the rules set out in the Prepaid Determination.

13

6       Vodafone accepts:

    (a)       the ACMA's findings about the contraventions of the Prepaid Determination as outlined in paragraph 5; and

    (b)       that there were material weaknesses in VHA's compliance control framework that allowed VHA to activate at least 1,028 Vodafone Prepaid Customers' Prepaid Mobile Services without first complying with the rules set out in Parts 4 or 5 of the Prepaid Determination.

35.     On this news, Vodafone's ADRs declined from a close price of $32.60 on January 09, 2018, to a close price of $31.44 on January 11, 2018, a drop of approximately -3.5% over two trading days.

36.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's ADRs, Plaintiff, and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

37.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Vodafone, their control over, and/or receipt and/or modification of Vodafone's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Vodafone, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

38.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's ADRs. As detailed above, when the truth about Vodafone's misconduct was revealed, the value of the Company's ADRs declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Vodafone's ADRs price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the ADRs price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's ADRs, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

39.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Vodafone's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Vodafone's ADRs to be artificially inflated. Plaintiff and other Class

members purchased Vodafone's ADRs at those artificially inflated prices, causing them to suffer the damages complained of herein.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

40.    At all relevant times, the market for Vodafone ADRs was an efficient market for the following reasons, among others:

(a)  Vodafone's ADRs met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

(b)  During the Class Period, Vodafone's ADRs were actively traded, demonstrating a strong presumption of an efficient market;

(c)  As a regulated issuer, Vodafone filed with the SEC periodic public reports during the Class Period;

(d)  Vodafone regularly communicated with public investors via established market communication mechanisms;

(e)  Vodafone was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f)  Unexpected material news about Vodafone was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

41.    As a result of the foregoing, the market for Vodafone ADRs promptly digested current information regarding Vodafone from all publicly available sources and reflected such information in Vodafone's stock price. Under these circumstances, all purchasers of Vodafone ADRs during the Class Period suffered similar injury through their purchase of Vodafone's ADRs

at artificially inflated prices, and a presumption of reliance applies.

42.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's financials and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in VOD.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

43.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

44.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

45.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Vodafone who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made

17

by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

46.    Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Vodafone ADRs on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

47.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Vodafone ADRs were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Vodafone or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these ADRs are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

48.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in

violation of the federal laws complained of herein.

49.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b)     whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)     whether the price of Vodafone's ADRs during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Vodafone's ADRs at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, each of the Defendants took the actions set forth herein.

54.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's ADRs in an effort to maintain artificially high market prices for Vodafone ADRs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Vodafone as specified herein.

56.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Vodafone's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Vodafone and its business operations and future prospects in the light

of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Vodafone ADRs during the Class Period.

57.    Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

58.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Vodafone's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its ADRs. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the

misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

59.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Vodafone's ADRs was artificially inflated during the Class Period. In ignorance of the fact that market prices of Vodafone's publicly-traded ADRs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the ADRs trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Vodafone's ADRs during the Class Period at artificially high prices and were or will be damaged thereby.

60.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Vodafone's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Vodafone's ADRs, or, if they had acquired such ADRs during the Class Period, they would not have done so at the artificially inflated prices that they paid.

61.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ADRs during the Class Period.

63.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of ADRs giving rise to the cause of action.

<u>**COUNT II**</u>
<u>***The Individual Defendants Violated Section 20(a) of the Exchange Act***</u>

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     The Individual Defendants acted as controlling persons of Vodafone within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

66.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.     As set forth above, Vodafone and the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

68.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

69.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of ADRs giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by

law; and

(e)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: January 18, 2018.

/s/ Eduard Korsinsky
**LEVI & KORSINSKY, LLP**
Eduard Korsinsky
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email:ek@zlk.com

*Attorneys for Plaintiff*